IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

THE UNITED STATES OF AMERICA,

     Plaintiff,

vs.                                          Civ. No.  09-1201 JP/RLP

COPAR PUMICE COMPANY, INC.,
KELLY ARMSTONG, RICHARD P. COOK,
SHIRLEY A. COOK, and DEBBIE CANTRUP,

     Defendants.

<u>MEMORANDUM OPINION AND ORDER</u>

On July 2, 2010, Defendants filed Defendants' Motion to Dismiss (*Res Judicata*) (Doc.

No. 18) (Motion to Dismiss).  Having reviewed the briefs and relevant law, the Court determines

that the Motion to Dismiss should be granted in part in that partial summary judgment should be

entered in favor of Defendants on the Plaintiff United States of America's (United States) pre-

April 3, 2006 claims for trespass, conversion, and unjust enrichment.

*A.  Background*

     *1. The Uncontested Facts as Presented in the Briefing on the Motion to Dismiss[1]*

The parties in this case have a lengthy and litigious history which has culminated in the

filing of this lawsuit and which serves as the basis for the Motion to Dismiss.  Material

documents and events central to deciding the Motion to Dismiss include the 2002 Settlement

Agreement between the parties; the 2003 Notice of Noncompliance (NON) issued by the United

States to Defendant Copar Pumice Company, Inc. (Copar); litigation in *Copar Pumice Co., Inc.*

*v. Bosworth, et al.*, Civ. No. 06-97 WJ/WPL (D.N.M.) (*Bosworth*); litigation in *Cook, et al. v.*

---

     [1]As will be discussed *infra*, the Court will treat the Motion to Dismiss as a motion for
summary judgment under Fed. R. Civ. P. 56.

*United States of America*, No. 08-337 L (Ct. of Fed. Claims) (*Cook II*); and the 2009 Notice of Indebtedness issued by the United States to Copar and Defendant Kelly Armstrong.  These documents and events are summarized below.

   a.  *Facts Pertaining to the Cook I Litigation and Leading to the 2002 Settlement Agreement*

In 1987 or the spring of 1988, Defendants Kelly Armstrong, Richard P. Cook, Shirley A. Cook, and Debbie Cantrup (collectively, Claimants) located[2] the Brown Placer Mining Claims for pumice on property within the Jemez Ranger District in the Santa Fe National Forest. In September 1988, the Claimants leased their rights to the Brown Placer Mining Claims to Copar.[3]

In September 1989, Copar applied to the United States Department of Interior's (DOI), Bureau of Land Management (BLM) for a mining patent for the Brown Placer Mining Claims to

---

[2]The General Mining Law of 1872, 30 U.S.C. §22-44 *et seq*., authorizes citizens to stake or "locate" a valid mining claim on federal lands when all other applicable statutory and regulatory requirements have been complied with.  There are two types of mining claims: patented and unpatented claims. "A patented claim is obtained by locating a valuable mineral deposit on the claim and then obtaining a patent certificate from the Government.  An unpatented mining claim is obtained by locating a deposit in a mineral vein or lode on public lands, and staking the boundaries of the claim.  In the latter case, title to the land where the mining claim is located remains with the Government, but the severed minerals and proceeds are the personal property of the miner."  *Copar Pumice Co., Inc. v. Bosworth*, 502 F.Supp.2d 1200, 1203 (D.N.M. 2007).

[3]Defendant Kelly Armstrong is the president of Copar which is owned and controlled by Defendant Kelly Armstrong, Defendant Debbie Cantrup, and Kate Allison Cook.  These three individuals are sisters and the daughters of Defendant Richard P. Cook.

extract pumice for stonewash laundry treatment,[4] landscaping, and manufacturing purposes. The BLM issued the first half of the Copar patent certificate in January 1991.

While the BLM was still evaluating the remainder of Copar's mining patent application, the United States Congress in 1993 passed the Jemez National Recreation Area Act of 1993 (JNRAA). The JNRAA created the Jemez National Recreation Area which encompasses the lands where the Brown Placer Mining Claims are located. The JNRAA potentially affected the Brown Placer Mining Claims by 1) prohibiting the issuance of patents for federal mining claims after May 30, 1991; 2) prohibiting the removal of common variety minerals; and 3) withdrawing the lands encompassing the Brown Placer Mining Claims from the operation of the federal mining laws.

In 1994, the DOI instituted an action to determine if the Brown Placer Mining Claims were valid considering the enactment of the JNRAA. The DOI determined that Claims 9-12 of the Brown Placer Mining Claims (also known as the El Cajete mine) were validly located for stonewash pumice but that the other 19 claims of the Brown Placer Mining Claims were not valid. The DOI further determined that the pumice from Claims 9-12 was locatable for the stonewash laundry industry only if the pumice was 3/4 of an inch or larger (+3/4" pumice).

In May 1994, Claimants filed a complaint in the Court of Federal Claims seeking damages against the United States under the Tucker Act, 28 U.S.C. §1491(a)(1). Claimants

---

[4]The Common Varieties Act of 1955, 30 U.S.C. §601 *et seq.*, removed common variety deposits, like ordinary pumice, from the General Mining Law of 1872 and made those deposits subject to sale by the government. *Bosworth*, 502 F.Supp.2d at 1204. Stonewash pumice, however, is distinct and has special value, i.e., it is an uncommon variety of pumice, so it is locatable and can, therefore, be mined under the federal mining laws. 30 U.S.C. §611 (excluding from Common Varieties Act of 1955 materials "which are valuable because the deposit has some property giving it distinct and special value...").

alleged that the enactment of the JNRAA resulted in an unlawful government taking of vested property rights in the mining patents they had expected to receive.  In 1999, the Court of Federal Claims held that the United States did not show that Copar had failed to comply with the final patent requirements or that the JNRAA had destroyed the vested property rights in the mining claims.  *See Cook v. United States*, 37 Fed. Cl. 435 (1997); *Cook v. United States*, 42 Fed. Cl. 788 (1999) (collectively, *Cook I*).

Meanwhile, in 1997, the Santa Fe National Forest approved a ten year Plan of Operations to allow Copar to mine and remove +3/4" pumice from the El Cajete mine to sell for use in the stonewash laundry industry.  The Plan of Operations provided that Copar screen out pumice less than 3/4 inches (known as common variety pumice) and stockpile that smaller pumice for use in a subsequent reclamation of the land. Copar mined the pumice at the El Cajete mine through November 2007 but apparently sold stockpiled pumice through February 2009.

In July 1998, Defendant Richard Cook indicated that Copar would take +3/4" pumice from the El Cajete mine and grind it to a smaller size to sell for common variety purposes and/or to use if Copar's source of common variety pumice ran out.  In a letter dated September 9, 1998, the Jemez District Ranger stated to Defendant Kelly Armstrong that the sale of pumice from the El Cajete mine for common variety purposes would conflict with the JNRAA.  The Jemez District Ranger further requested "from Copar some means of verification that the pumice removed from the El Cajete mine is currently and continually selling for garment finishing uses, at a value above that of construction grade pumice in general."  Ex. 1, letter at 2 (attached to Declaration of Larry Gore (Doc. No. 27), filed Aug. 20, 2010).  In a February 12, 1999 letter to the Jemez District Ranger, Copar's counsel stated that "Copar has assured me that it is marketing its plus 3/4 inch pumice in sufficient quantities to create a profit from a market giving the

4

pumice a distinct and special value over common varieties of pumice." Ex. 2, letter at 1

(attached to Declaration of Larry Gore (Doc. No. 27)).  Copar's counsel did not provide any kind

of verification of the volume of pumice sold for stonewash laundry industry purposes but noted

that "the validity of these claims is at issue in litigation." *Id*.

On April 4, 2002, the United States and the Defendants entered into a Settlement

Agreement resolving the *Cook I* litigation.  The United States paid Claimants $3,911,838.00 in

compensation for the lost right to seek a patent for Claims 9-12, including the right to mine

common variety pumice.  In return, Claimants and Copar relinquished all of their claims against

the United States that were or could have been raised in the Court of Federal Claims and DOI

proceedings.  The Settlement Agreement further provided that Claims 9-12 of the Brown Placer

Mining Claims were to be held by Claimants "'as unpatented mining claims subject to all

pertinent statutes and regulations.'"  Amended Complaint for Trespass, Conversion, Unjust

Enrichment, Damages, and Declaratory and Injunctive Relief (Doc. No. 22)(Amended

Complaint) at ¶26, filed July 16, 2010.  Claimants and Copar also acknowledged that they were

"'prohibited from the disposal of common variety pumice'" by the JNRAA.  *Id*.

>    b. *Facts Leading to Santa Fe National Forest's Issuance of the 2003 Notice of*
>       *Noncompliance (NON)*

On October 2, 2002, Defendant Kelly Armstrong told Forest Service officials that Copar

was crushing the +3/4" pumice from the El Cajete mine to sell for common variety purposes.

In a letter dated October 15, 2002, the Jemez District Ranger informed Defendant Kelly

Armstrong that the sale of pumice from the El Cajete mine for common variety purposes

conflicts with the JNRAA and federal mining laws.  On March 18, 2003, the Santa Fe National

Forest Supervisor sent a letter to Copar "again expressing concern about the potential common

variety use of the pumice from the El Cajete mine.  The Forest Supervisor and Copar's Attorney

met and discussed what Copar would need to provide to the [Santa Fe National] Forest to verify

the use of the pumice."  Declaration of Larry Gore (Doc. No. 27) at ¶11.  By an affidavit and a

November 14, 2003 letter, Defendant Kelly Armstrong provided the Santa Fe National Forest

with some information about the volume of pumice Copar sold to the stonewash laundry

industry from 1999 through 2003.

On December 23, 2003, the Santa Fe National Forest issued a Notice of Noncompliance

(NON) to Copar for not providing "verifiable proof of the stonewash laundry industry use of the

pumice removed from El Cajete Mine" as required by Forest Service regulations.  Ex. 5, NON

at 1 (attached to Declaration of Larry Gore (Doc. No. 27)).  The NON noted that "[t]he removal

of pumice in excess of the stonewash industry pumice is unnecessarily causing injury, loss or

damage to surface resources by causing surface disturbance exceeding what is necessary to

extract stonewash laundry industry pumice." *Id*.  The NON also "directed that the removal of

common variety pumice cease and prescribed certain corrective actions, which required the

modification of the Plan of Operations for the El Cajete Mine to restrict the use and disposition

of pumice minerals removed from the site only to the stonewash laundry industry." Ex. A,

Petition for Review and Reversal of Agency Decision for Appeal #04-03-00-0013-A251, El

Cajete Mine (Doc. No. 1) at ¶11, filed Feb. 3, 2006 (*Bosworth* Petition for Review and

Reversal)(attached to Defendants' Memorandum in Support of Motion to Dismiss (*Res Judicata*)

(Doc. No. 19)).  Furthermore, the NON stated "Copar must ... [p]rovide the Santa Fe National

Forest complete records since April of 2002 showing how much pumice was removed each

month (total production, not just stonewash laundry industry pumice), and the names and contact

information for the purchasers of the pumice ... by January 9, 2004 ...."  Ex. 5, NON at 2

6

(attached to Declaration of Larry Gore (Doc. No. 27)).  "At the time the [NON] was issued, the [Santa Fe National] Forest only had a rough estimate of how much pumice Copar was mining and how much Copar was selling for locatable uses."  Declaration of Larry Gore (Doc. No. 27) at ¶14.

### c.  Facts Pertaining to the Bosworth Litigation

In February 2004, Copar appealed the NON to the Forest Service's Southwestern Regional Office.  In November 2005, the Southwestern Regional Office upheld the NON.  As a result of the Southwestern Regional Office's determination, Copar filed a lawsuit in this Court in February 2006 to challenge that determination, *Copar Pumice Co., Inc. v. Bosworth*, *et al*, Civ. No. 06-97 WJ/WPL (D.N.M.).  In its answer to the federal lawsuit, the United States[5] raised the following pertinent affirmative defenses: Copar committed trespass to remove non-locatable pumice; Copar caused "injury or depredation of property;" and Copar committed "unauthorized appropriation of government property."  Ex. B, Answer to Petition for Review and Reversal of Agency Decision (Doc. No. 9) at 9, filed April 3, 2006 (attached to Defendants' Memorandum in Support of Motion to Dismiss (*Res Judicata*)).  Interestingly, in September 2006, March 2007, and April 2007, Santa Fe National Forest Service employees witnessed Copar unlawfully removing undersized pumice from the El Cajete mine.

On July 5, 2007, the Honorable United States District Court Judge William "Chip" Johnson upheld the Southwest Regional Office's determination affirming the issuance of the NON.  *Copar Pumice Co., Inc. v. Bosworth*, 502 F.Supp.2d 1200 (D.N.M. 2007).  Copar appealed Judge Johnson's decision to the Tenth Circuit Court of Appeals which subsequently

---

[5]Although the Defendants in *Bosworth* were various Forest Service employees, the Court will simply refer to the United States as the defendant in *Bosworth*.

affirmed Judge Johnson's decision.  *Copar Pumice Co. v. Tidwell*, 603 F.3d 780 (10th Cir.

2010).

### d.  Facts Pertaining to the Cook II Litigation

In February 2008, the United States filed a Contest Complaint with the BLM alleging

that Claims 9-12 of the Brown Placer Mining Claims were null and void because the pumice is

not a valuable mineral deposit and it does not exist in sufficient quantity or quality to be

considered a valuable mineral deposit. In April 2008, in response to the Contest Complaint,

Defendants filed in the Court of Federal Claims a Motion to Enforce Settlement Agreement and

for Damages (*Cook II*).  Ex. D (attached to Defendants' Memorandum in Support of Motion to

Dismiss (*Res Judicata*)).  Defendants contended that the United States breached the 2002

Settlement Agreement when it filed the Contest Complaint with the BLM, and when it ordered

"all mining operations to cease on the claims, instructed that reclamation should proceed and

[had] refused to extend existing plans of operations or process new plans of operations."  *Id*. at

¶¶7 and 8.  The Court of Federal Claims construed the Motion to Enforce Settlement Agreement

and for Damages "as a complaint in a new proceeding with a new docket number, without

prejudice to plaintiff's [sic] rights, if any, to argue that the court retained jurisdiction to enforce

the agreement."  Ex. E, Order, filed May 6, 2008 (attached to Defendants' Memorandum in

Support of Motion to Dismiss (*Res Judicata*)).  The United States then filed Defendant's Motion

to Dismiss for Failure to State a Claim and for Lack of Jurisdiction.  *See* Ex. F, filed Aug. 26,

2008 (attached to Defendants' Memorandum in Support of Motion to Dismiss (*Res Judicata*)).

One of the grounds for dismissal which the United States raised was the doctrine of *res judicata*

as it applied to the *Bosworth* decision.  *Id*.  The Court of Federal Claims subsequently granted

Defendant's (United States') Motion to Dismiss for Failure to State a Claim and for Lack of

Jurisdiction and dismissed the *Cook II* litigation.  Ex. G, Judgment, filed March 3, 2009

(attached to Defendants' Memorandum in Support of Motion to Dismiss (*Res Judicata*)).

> ### e.  Facts Leading to the United States' Issuance of the 2009 Notice of Indebtedness

Following Judge Johnson's 2007 decision in *Bosworth*, Copar provided to the Santa Fe

National Forest partial business records starting in April 2002 regarding the volume of pumice

removed from the El Cajete mine, the sale values of that pumice, and the end use of pumice

taken from the El Cajete mine.   "The initial records were provided to the [Santa Fe National

Forest] in several shipments between November 2007 and March 2008."  Declaration of Larry

Gore (Doc. No. 27) at ¶22.  On October 9, 2008, the Santa Fe National Forest completed data

entry and analysis of the business records Copar had provided.  The Santa Fe National Forest

"concluded Copar removed and sold approximately $8.7 million worth of pumice (384,049 tons)

into markets other than the stonewash laundry industry between April 2002 and November

2007."  Declaration of Kevin Grandinetti (Doc. No. 29) at ¶3, filed Aug. 20, 2010.  On October

15, 2008, the Santa Fe National Forest requested that the United States Department of

Agriculture's Resource Audit Branch (RAB) audit "(1) the methodology used for data entry and

analysis of data provided by Copar, and (2) the validity of the figures resulting from that

analysis."  *Id*. at ¶4.  In reviewing the data, the RAB discovered missing records and receipts.

Consequently, the RAB mailed a certified letter dated January 29, 2009 to Copar requesting that

Copar provide the United States with those missing records and receipts by February 28, 2009.

On March 31, 2009, the RAB certified that the Santa Fe National Forest's conclusions

were reliable even though the business records were still not complete and that Copar removed

from the Santa Fe National Forest, without authorization, approximately 385,502 tons of pumice

valued at approximately $8.7 million dollars.[6]  On June 1, 2009, the Santa Fe National Forest supervisor requested by letter that the Albuquerque Service Center (ASC) issue a bill to Copar to pay for the value of the pumice it removed without authorization.  On June 16, 2009, the ASC Claims Branch mailed a Notice of Indebtedness and a bill to Copar and to Defendant Kelly Armstrong for $8,743,416.49.  The Notice of Indebtedness and bill were based on Copar's trespass on National Forest System lands and its conversion of federal property by taking pumice it was not authorized to mine and had no legal right to sell.  The Notice of Indebtedness and bill also informed Copar and Defendant Kelly Armstrong that the debt would be referred to the United States Department Justice (DOJ) if they did not take any action on the Notice of Indebtedness within 30 days.  Defendants did not respond to the Notice of Indebtedness and bill.  On July 21, 2009, the ASC Claims Branch referred the Notice of Indebtedness to the Department of Agriculture's Office of General Counsel requesting a referral to the DOJ for settlement negotiation or cost recovery litigation.

As late as June 2009, Copar provided the Santa Fe National Forest with additional business records.  The Santa Fe National Forest, however, does not yet have complete business records accounting for the pumice removed from the El Cajete mine during the relevant time period.  In fact, "7,300 [documents] are believed to still be missing.  Thus, Copar has only provided about 81% of the records believed to document pumice mining and sale from the El Cajete Mine."  Declaration of Larry Gore (Doc. No. 27) at ¶27.

---

[6]The value of the pumice unlawfully removed from the El Cajete mine "has changed as new information in the form of additional records from Copar has been provided to the Forest Service."  Declaration of Larry Gore (Doc. No. 27) at ¶23.

Based on the partial business records to date, "the United States estimates that Copar mined, removed, and sold more than 400,000 tons of pumice from El Cajete Mine from April 2002 through February 2009.  Copar's business records provided to date indicate that less than 18,000 tons were sold to the stonewash laundry industry during the same time period.  The United States estimates that more than 380,000 tons of pumice was removed from El Cajete Mine by Copar and sold for common variety purposes during the relevant time period."  Amended Complaint at ¶37.

   *2. The Amended Complaint*

After the Defendants filed the Motion to Dismiss but before the United States responded to the Motion to Dismiss, the United States filed an Amended Complaint. The Amended Complaint added a claim for unjust enrichment.  It is well-settled that an amended complaint supersedes the original complaint.  *Miller v. Glanz*, 948 F.2d 1562, 1565 (10th Cir. 1991).  Hence, the Motion to Dismiss is now technically moot because the Motion to Dismiss was directed at the original complaint which is no longer operative.  *See Mink v. Suthers*, 482 F.3d 1244, 1254 (10th Cir. 2007) (an amended complaint "'renders the original complaint without legal effect.'") (citations omitted).  However, the arguments in the Motion to Dismiss apply equally to the Amended Complaint and the parties have treated the Motion to Dismiss as applying to the Amended Complaint.  Consequently, the Court will evaluate the Motion to Dismiss as it pertains to the Amended Complaint.  *See Gotfredson v. Larsen LP*, 432 F. Supp.2d 1163, 1172 (D. Colo. 2006) (evaluating motions to dismiss with respect to a second amended complaint filed after defendants filed the motions to dismiss).

The United States alleges in the Amended Complaint that "Defendants were authorized to extract and remove only locatable pumice from [the El Cajete mine] for sale to the stonewash

11

laundry industry."  Amended Complaint at ¶49.  The United States further alleges that

"Defendants were prohibited by the JNRAA, the 2002 Settlement Agreement, and federal

mining laws from removing and extracting common variety minerals from El Cajete Mine."  *Id.*

at ¶50.  The United States contends that from April 2002 through February 2009 Defendants,

nonetheless, unlawfully extracted and removed pumice for common variety purposes.

Consequently, the United States asserts that Defendants unlawfully trespassed on federal land to

extract and mine pumice for common variety purposes; Defendants unlawfully converted federal

property by extracting and removing pumice for common variety purposes; and Defendants were

unjustly enriched by selling pumice for common variety purposes.  The United States requests a

declaratory judgment, compensatory damages, and permanent injunctive relief.

### B.  Preliminary Procedural Matters

Defendants bring the Motion to Dismiss as a Fed. R. Civ. P. 12(b)(6) motion to dismiss

for failure to state a claim upon which relief can be granted.  A Rule 12(b)(6) motion to dismiss

"must be made before pleading if a responsive pleading is allowed."  If the pleadings are closed,

then the appropriate means to challenge the sufficiency of a complaint is by moving for a

judgment on the pleadings.  *See* Fed. R. Civ. P. 12(c)("After the pleadings are closed–but early

enough not to delay trial–a party may move for judgment on the pleadings.").

When Defendants filed the Motion to Dismiss it was directed at the original complaint

and it was filed after the pleadings concerning the original complaint had already closed.

Because the pleadings had closed, the Court will not treat the Motion to Dismiss as a Rule

12(b)(6) motion but will instead construe the Motion to Dismiss as a motion for a judgment on

the pleadings. As discussed above, the Court will treat the Motion to Dismiss as being directed at

the Amended Complaint.  In reviewing a motion for a judgment on the pleadings, the Court,

nonetheless, uses the same standard of review that applies to a Rule 12(b)(6) motion to dismiss. *See Park University Enterprises, Inc. v. American Cas. Co. of Reading, PA*, 442 F.3d 1239, 1244 (10th Cir. 2006).

A Rule 12(b)(6) standard of review is, however, subject to conversion to a Fed. R. Civ. P. 56 summary judgment standard of review "if matters outside the complaint are presented to and not excluded by the court...." *Glanz*, 948 F.2d at 1565 (citing Rule 12(b)). In this case, the parties have presented to the Court numerous documents outside of the Amended Complaint which the Court must examine in order to resolve the Motion to Dismiss. Under these circumstances, the Court must convert the Motion to Dismiss into a Rule 56 motion for summary judgment. To convert the Motion to Dismiss into a Rule 56 motion for summary judgment, the Court must ensure there is "notice and opportunity for the parties to present relevant evidence." *David v. City and County of Denver*, 101 F.3d 1344, 1352 (10th Cir. 1996), *cert. denied*, 522 U.S. 858 (1997)(citations omitted). "The required notice may be actual or constructive, and in some circumstances, courts have concluded that the submission of evidentiary materials by the movant, the nonmovant, or both of them constitutes sufficient notice." *Id*. Here, the fact that both the United States and Defendants have submitted evidentiary materials and have, in essence, treated the Motion to Dismiss like a Rule 56 motion for summary judgment constitutes sufficient notice to the parties that the Court will convert the Motion to Dismiss into a Rule 56 motion for summary judgment.

*C. Summary Judgment Standard of Review*

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). When applying this standard, the Court examines the factual record and reasonable inferences therefrom in the

light most favorable to the party opposing summary judgment. *Applied Genetics Intl, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990). The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Only then does the burden shift to the non-movant to come forward with evidence showing that there is a genuine issue of material fact. *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991).  An issue of material fact is genuine if a reasonable jury could return a verdict for the non-movant. *Kaul v. Stephan*, 83 F.3d 1208, 1212 (10th Cir.1996) (citation omitted). The non-moving party may not avoid summary judgment by resting upon the mere allegations or denials of the non-movant's pleadings. *Bacchus Indus., Inc.*, 939 F.2d at 891.

*D.  Discussion*

Defendants argue that this lawsuit is barred by the *res judicata* doctrine of claim preclusion.  First, Defendants specifically contend that the United States should have raised its trespass, conversion, and unjust enrichment claims as compulsory counterclaims in *Bosworth* and that, alternatively, claim preclusion based on *Bosworth* bars those claims.  Second, Defendants contend that the United States should have raised its trespass, conversion, and unjust enrichment claims as outright claims in *Cook II*.[7]

---

[7] Defendants further argue in the Motion to Dismiss that the United States should have brought its trespass, conversion, and unjust enrichment claims as compulsory counterclaims in *Cook II*.  Defendants, however, apparently abandoned that argument in Defendants' Reply in Support of Motion to Dismiss (Doc. No. 35) at 18-20, filed Sept. 7, 2010.

1. *Failure to Assert Compulsory Counterclaims in Bosworth*

In federal court, failure to assert a compulsory counterclaim "will result in it being barred in any subsequent action...."[8]  The Late Charles Alan Wright, Arthur R. Miller, and Mary Kay Kane, 6 *Federal Practice and Procedure* §1409 at 46 (2010).  *See also  Stone v. Department of Aviation*, 453 F.3d 1271, 1280 (10th Cir. 2006)("principles of claim preclusion only oblige a defendant to assert a compulsory counterclaim"); *Brotherhood of R.R. Trainmen v. Denver & R.G.W.R. Co.,* 31 F.R.D.. 297, 299 (D. Colo. 1962)("'Indeed the doctrine of *res judicata* compels the counterclaimant to assert his claim in the same suit for it would be barred if asserted separately, subsequently.'"(citation omitted)).  Fed. R. Civ. P. 13(a)(1) states, in pertinent part, that "[a] pleading must state as a [compulsory] counterclaim any claim that–at the time of its service–the pleader has against an opposing party if the claim ... arises out of the transaction or occurrence that is the subject matter of the opposing party's claim...."  The Tenth Circuit Court of Appeals has explained that a counterclaim is compulsory under Rule 13(a)(1) if the counterclaim is mature at the time the answer is served and the following factors support a determination that the counterclaim should be considered compulsory: 1) "the issues of fact and law raised by the principal claim and the counterclaim are largely the same;" 2) "the same evidence supports or refutes the principal claim and the counterclaim;" 3) "there is a logical relationship between the claim and the counterclaim;" and 4) "res judicata would bar a subsequent suit on defendant's claim...."  *F.D.I.C. v. Hulsey*, 22 F.3d 1472, 1487 (10th Cir. 1994)(citation omitted).

---

[8]In contrast to a failure to raise a compulsory counterclaim, "[a] defendant's failure to assert a permissive counterclaim will not [necessarily] preclude that party from instead raising it as a separate claim in a later action."  *Raytheon Aircraft Co. v. United States*, 532 F.Supp.2d 1316, 1322 (D. Kan. 2008)(quoting *Restatement (Second) of Judgments* §22).

*a.  Were the United States' Claims for Trespass, Conversion, and Unjust
Enrichment Mature When the United States Filed Its Answer in Bosworth?*

The Defendants contend that the United States' claims for trespass, conversion, and

unjust enrichment were mature at the time that the United States answered the *Bosworth* Petition

for Review and Reversal on April 3, 2006.  *See* Answer to Petition for Review and Reversal of

Agency Decision (Doc. No. 9) (*Bosworth* Answer), filed in *Bosworth*, Civ. No. 06-97 WJ/WPL

(D.N.M.).  In fact, Defendants note that the United States must have known about the claims for

trespass and conversion at the time it filed the *Bosworth* Answer because the United States raised

those claims as affirmative defenses in the *Bosworth* Answer at 9.  The Defendants further

contend that the same mining activities at issue in *Bosworth* also provide the basis for the United

States' current claims.  The United States asserts that its claims for trespass, conversion, and

unjust enrichment did not mature until the Forest Service followed the administrative procedure

for debt collection and issued the 2009 Notice of Indebtedness.  The United States also observes

that because the claims for trespass and conversion are continuing, "the acts of trespass and

conversion post-dating the answer in *Bosworth* cannot be barred."  The United States' Response

in Opposition to Defendants' July 2, 2010 Motion to Dismiss [Dkt. #18] (Doc. No. 26) at 15

n.11.

Rule 13(a)(1) does not apply if a claim is not mature at the time a defendant files an

answer to the lawsuit.  In other words, "[w]here a defendant acquires a claim after his answer has

been filed it is not a compulsory counterclaim even if it arises out of the same transaction."  *Arch

Mineral Corp. v. Lujan*, 911 F.2d 408, 412 (10th Cir. 1990). Cases which discuss whether a

claim is mature for Rule 13(a)(1) purposes use the term "accrue" interchangeably with the term

"mature."  *See, e.g., Pike v. Freeman*, 266 F.3d 78, 92 n.17 (2nd Cir. 2001); *New York Life Ins.*

16

*Co. v. Deshotel*, 142 F.3d 873, 879 (5th Cir. 1998).  Generally, a claim matures or accrues at "the point from which a statute of limitations would run."  *Cabrera v. Courtesy Auto, Inc.*, 192 F.Supp.2d 1012, 1015 (D. Neb. 2002).  In the context of "'federal law governing statutes of limitations, a cause of action accrues when all events necessary to state a claim have occurred.'" *Phillips Petroleum Co. v. Lujan*, 4 F.3d 858, 861 (10th Cir. 1993)(citation omitted).

The United States argues primarily that its claims did not mature until an audit was completed and it issued the 2009 Notice of Indebtedness several years after the *Bosworth* Answer was filed in 2006.  The United States relies on *Arch Mineral Corp. v. Lujan*, 911 F.2d 408 (10th Cir. 1990) to support that argument.  In *Arch*, the plaintiff, Ark[9] (a lessee holding coal leases with the United States), argued that the defendant, the United States Secretary of Interior, should have asserted a compulsory counterclaim for unpaid rents and royalties in two previous lawsuits in which Ark challenged its readjusted coal leases.  Ark maintained that the claim for unpaid rents and royalties matured prior to the Secretary of Interior's answers in those two previous lawsuits when the Interior Board of Land Appeals (IBLA) rejected Ark's contentions that the BLM's notices of intent to readjust the lease terms were untimely and that the Federal Coal Leasing Amendments Act did not apply to pre-1976 coal leases.  The Secretary of Interior argued that the claims were not mature when the IBLA made its decisions but instead became mature later when he instituted administrative procedures, including an audit, after the first lawsuit  "to determine whether there had in fact been underpayment, and if so, how much, and that any claim matured when Ark backed off the administrative process and filed the instant proceeding...."  *Id.* at 413.  The Tenth Circuit Court of Appeals agreed with the Secretary of

---

[9]The Tenth Circuit referred to Arch Mineral Corporation and its wholly owned subsidiary, Ark Land Company, collectively as Ark.

Interior and determined that he did not have a mature claim for undpaid rents and royalties at the time he was required to file answers in the two previous lawsuits. *Id*. at 414.

Although *Arch* appears compelling at first glance, it is distinguishable from this case in several ways. First, *Arch* concerns readjusted coal leases and their audits which are governed by a completely different administrative scheme than the one at issue in this case. *See id*. at 413 (Ark's reliance on a specific regulation regarding readjusted lease terms, 43 C.F.R. §3451.2(e), "cannot be read in isolation and must be considered along with the entire administrative scheme which governs the Secretary in his efforts to collect rents and royalties, be they readjusted, adjusted, or non-adjusted."). In this case, the United States' claims are based on federal common law principles as well as violations of the JNRAA, federal mining laws, and the 2002 Settlement Agreement. Second, the Secretary of Interior in *Arch* instituted an audit after the first lawsuit to determine if there actually was a claim, i.e., an underpayment. Here, the United States knew in 2002, prior to the filing of the *Bosworth* lawsuit, that it had a basis for its trespass, conversion, and unjust enrichment claims, i.e., that Copar was unlawfully crushing pumice for common use purposes. *See* Amended Complaint at ¶27 (on Oct. 2, 2002, Defendant Kelly Armstrong told Forest Service officials that Copar was crushing pumice to sell for common variety purposes). The subsequent audit simply quantified the amount of unlawfully removed pumice and its value. In other words, the audit substantiated damages but did not serve as the actual basis for any accrued claim. *See, generally, United States v. Gavilan Joint Community College Dist.*, 849 F.2d 1249, 1249-50 (9th Cir. 1988) ("what is important is when the Government first discovered that it had a claim against [defendant];" uncertainty as to the amount of damages "does not constitute lack of knowledge of a fact 'material to the right of action.' Parties are not entitled to delay instituting a claim until they know the exact dollar amount; the Government here

18

essentially asserts that it may postpone litigation indefinitely through delay in conducting its own audit.  This is not a tenable position."); *Atlantic Richfield Co. v. Lujan*, 811 F.Supp. 1520, 1524 (N.D. Okla. 1992) ("Defendants argue that the underpayments were not 'due' until the audit was completed and the Order was issued. ... There is simply no support for this theory.  Neither a demand for payment, nor an awareness of any underpayment, is necessary for a cause of action to accrue.").  Because *Arch* does not provide convincing legal support for the United States' theory that its claims matured when it issued the 2009 Notice of Indebtedness, the Court will focus on the individual accrual dates of each of the United States' claims.

*(1) Accrual of the Trespass Claim*

A crucial question in determining when a trespass claim accrues "is whether the injuries sustained are permanent (fixed) or continuing (sometimes referred to as 'temporary')."  *United States v. Hess*, 194 F.3d 1164, 1176 n.12 (10th Cir. 1999).  In this case, the injury from the alleged trespass is continuing in nature because the trespass claim arises from "a continuing series of [mineral] extractions and sales...."  *Id*.  A continuing trespass accrues as of the date of the last injury.  *Id*. at 1176 (citing *Tiberi v. CIGNA Corp.*, 89 F.3d 1423, 1430 (10th Cir. 1996)).

The United States alleges that its trespass claim began in April 2002 (prior to the filing of the *Bosworth* Answer on April 3, 2006) and continued until February 2009.  *See* Amended Complaint at ¶37.  Accordingly, at the time the United States filed its *Bosworth* Answer on April 3, 2006, the date of the last alleged trespass would have been sometime prior to April 3, 2006. This conclusion is supported by the United States' decision to raise a trespass affirmative defense in the *Bosworth* Answer. The United States, therefore, accrued a continuing trespass claim by April 3, 2006.  However, any alleged trespass that occurred after April 3, 2006 was not mature at the time of the United States filed the *Bosworth* Answer and could not have formed the

19

basis of a compulsory counterclaim in *Bosworth*.

### (2) Accrual of the Conversion Claim

It is unclear whether conversion, like trespass, can be considered a continuing tort.  *See* 18 Am. Jur. 2d *Conversion* § 4 (2d ed.). Nonetheless, like the United States' trespass claim, the United States alleges that the conversion claim (whether considered as discrete claims or a continuing claim) began in April 2002 and continued until February 2009.  Hence, when the United States filed the *Bosworth* Answer on April 3, 2006, the United States had at that time accrued at least one conversion claim.  This determination is supported by the United States' affirmative defense in the *Bosworth* Answer that Copar appropriated government property without authorization.  On the other hand, any claims for conversion arising after April 3, 2006, were not mature and consequently could not have been compulsory counterclaims.

### (3) Accrual of the Unjust Enrichment Claim

As with the trespass and conversion claims, the United States alleges that unjust enrichment occurred prior to the filing of the April 3, 2006 *Bosworth* Answer and continued until February 2009.  *See* Amended Complaint at ¶37.  Any alleged unjust enrichment occurring before April 3, 2006 would, therefore, have accrued or become mature when the United States filed the *Bosworth* Answer.  Allegations of unjust enrichment occurring after April 3, 2006 would, however, not have been mature.  Consequently, a later unjust enrichment claim could not have been the basis of a compulsory counterclaim.  In sum, the pre-April 3, 2006 claims for trespass, conversion, and unjust enrichment were mature at the time the United States filed the *Bosworth* Answer.  The Court will, therefore, analyze whether the United States should have

raised the pre-April 3, 2006 claims as compulsory counterclaims in *Bosworth*.[10]

> ### b.  Are the Issues of Fact and Law Raised in Bosworth Largely the Same as the Issues of Fact and Law Raised by the Pre-April 3, 2006 Claims for Trespass, Conversion, and Unjust Enrichment?

Defendants argue next that the issues of fact and law raised in *Bosworth* are largely the same as the issues of fact and law regarding the pre-April 3, 2006 claims in this case. Defendants note that in defending the issuance of the NON in *Bosworth* the United States asserted that Copar was removing pumice for common variety purposes and raised affirmative defenses of trespass and conversion, the same factual and legal bases for the pre-April 3, 2006 claims.  The United States contends, however, that the issues of fact and law in *Bosworth* are not largely the same as the issues of fact and law raised by the pre-April 3, 2006 claims in this lawsuit because in *Bosworth* Judge Johnson was reviewing an administrative decision under an arbitrary and capricious standard whereas in this case, the United States seeks *de novo* review of Defendants' actions and the resulting damages.

Copar sought in *Bosworth* a review and a reversal of the United States' final decision to affirm the NON.  Copar asserted that established law did not allow the Forest Service to control the end use of locatable minerals mined in accordance with an unpatented mining claim, that the Forest Service exceeded its authority and violated federal regulations with respect to its notice and actions in furtherance of the NON, that the Forest Service's notice and actions in furtherance of the NON constituted an improper attempt to modify the El Cajete mine's Plan of Operation, and that the Forest Service's actions under the Administrative Procedures Act (APA) were

---

[10]Although the parties do not distinguish between the pre- and post-April 3, 2006 claims, the remainder of the discussion concerning the preclusive effect of *Bosworth* will make that distinction.

arbitrary and capricious.  In addition, Copar sought only injunctive and declaratory relief in

*Bosworth*.  As noted above, the United States answered the *Bosworth* Petition for Review and

Reversal with affirmative defenses of trespass, "injury or depredation of government property,"

and "unauthorized appropriation of government property."

The pre-April 3, 2006 claims for trespass, conversion, and unjust enrichment arguably

share the same basic underlying factual issue as that raised in *Bosworth*.  In *Bosworth*, Copar

based its claims, at least in part, on the assertion that the United States had "no [factual] basis to

find that there was irreparable injury to surface resource" due to the amount of pumice extracted

for common use purposes.[11]  *See Bosworth*, 502 F.Supp.2d at 1217-18.  The factual issue of the

amount of pumice extracted for common use purposes is likewise raised with respect to the pre-

April 3, 2006 claims and is particularly relevant to the damages the United States seeks in this

case.

The legal issues in *Bosworth* and the legal issues regarding the pre-April 3, 2006 claims,

however, are not largely the same.  First, although it seems that the *Bosworth* Petition for

Review and Reversal was not entirely based on a request for an APA arbitrary and capricious

review, the parties, Judge Johnson, and the Tenth Circuit Court of Appeals restricted the

standard of review in *Bosworth* to an arbitrary and capricious standard.[12]  *See Tidwell*, 603 F.3d

---

[11]Judge Johnson ultimately determined that the exact amount of pumice extracted for
common use purposes was "not relevant to the central issue: whether the Forest Service can
require an accounting of the end use of all pumice mined from El Cajete, based on its
interpretations of federal law."  *Bosworth*, 502 F.Supp.2d at 1215.

[12]Defendants allege that Judge Johnson could not have properly applied an arbitrary and
capricious standard because he examined the "Bell" affidavit which was not part of the
administrative record.  Judge Johnson's reference to the "Bell" affidavit, however, is a reference
to the administrative record.  *Bosworth*, 502 F.Supp.2d at 1206.

at 793-94; *Bosworth*, 502 F.Supp.2d at 1209.  *See also* Ex. H, *Bosworth* Initial Pretrial Report

(Doc. No. 28) at 3, filed June 12, 2006 ("The Parties agree that discovery is not necessary

because this case is an appeal from an administrative decision and will involve a review of the

Administrative Record and briefs.")(attached to Defendants' Reply in Support of Motion to

Dismiss).  An arbitrary and capricious review of an administrative decision contains very

different legal issues than a lawsuit for money damages resulting from alleged trespass,

conversion, and unjust enrichment.  Second, although the United States raised the affirmative

defenses of trespass and unauthorized appropriation of government property in *Bosworth*, the

United States did not argue those defenses because the focus of the lawsuit was whether the

Forest Service's decision regarding the NON was arbitrary and capricious.  *See* Ex. I, United

States' Response Brief (Doc. No. 21), filed July 31, 2006 (attached to Defendants' Reply in

Support of Motion to Dismiss).  To summarize, although the same issue of fact is raised in both

*Bosworth* and the pre-April 3, 2006 claims, the issues of law in *Bosworth* are not largely the

same as those raised in the pre-April 3, 2006 claims in this case.

> *c.  Does the Same Evidence Support or Refute the Claims in Bosworth and the Pre-April 3, 2006 Claims?*

Defendants correctly assert that prior to the filing of the *Bosworth* Answer the United

States had some evidence in 2003 regarding the volume of pumice sold by Copar to the

stonewash laundry industry from 1999 to 2003.  *See* Amended Complaint at ¶29 ("By affidavit

and letter dated November 14, 2003, Kelly Armstrong provided the Santa Fe National Forest

with some information regarding the volumes of pumice sold by Copar into the stonewash

laundry industry from 1999 through 2003.").[13]  The United States relied on this evidence in

issuing the 2003 NON and could have relied on it to support the pre-April 3, 2006 claims for

trespass, conversion, and unjust enrichment.  Defendants further observe that because the

*Bosworth* Petition for Review and Reversal contained original causes of action aside from the

APA cause of action, the United States could have engaged in discovery in *Bosworth* to support

the pre-April 3, 2006 claims for trespass, conversion, and unjust enrichment.

   The United States argues, on the other hand, that the partial disclosure of the volume of

pumice sold to the stonewash laundry industry from 1999 through 2003 would have been

insufficient to support its claims.  The United States contends that it would have also needed the

following evidence: "complete mining and sales records, including haul tickets, invoices, and the

identities of Copar's customers; the end-use of the sold pumice; Copar's corporate structure and

related businesses and other entities; Claimants [sic] relationship with Copar and involvement in

Copar's activities; facts showing Defendants' misrepresentation, concealment, intent or bad faith

in connection with their trespass."  The United States' Response in Opposition to Defendants'

July 2, 2010 Motion to Dismiss [Dkt. #18] at 17.  Additionally, the United States refers to other

evidence Defendants would have needed to refute the pre-April 3, 2006 claims for trespass,

conversion, and unjust enrichment.  Contrary to the Defendants' assertion that the United States

could have discovered additional evidence in *Bosworth*, that evidence was not subject to

discovery in *Bosworth* because the parties had agreed not to engage in discovery and restricted

---

[13]Defendants further note that the United States alleges in the Amended Complaint at ¶25
that "[f]ollowing the 2007 Bosworth decision, Copar provided partial business records to the
Santa Fe National Forest, indicating volume of pumice removed, sale values, and end use of the
pumice taken from El Cajete Mine from April 2002 through 2009.  The records provided were
incomplete."  Obviously, the United States did not have this information on April 3, 2006 to
support any pre-April 3, 2006 claims for trespass, conversion, and unjust enrichment.

the lawsuit to a review of the administrative record.  Consequently, the evidence necessary to

support or refute the claims in *Bosworth* constituted only a portion of the evidence needed to

support or refute the pre-April 3, 2006 claims for trespass, conversion, and unjust enrichment.

> *d. Is There a Logical Relationship Between the Bosworth Claims and the Pre-April 3, 2006 Claims for Trespass, Conversion, and Unjust Enrichment?*

Defendants argue that a logical relationship exists between the *Bosworth* claims and the

pre-April 3, 2006 claims for trespass, conversion, and unjust enrichment because they all

involved Copar's mining activities.  The United States argues, however, that a relationship based

on Copar's mining activities is too broad or attenuated to make the pre-April 3, 2006 claims for

trespass, conversion, and unjust enrichment compulsory counterclaims.  The United States

maintains that the *Bosworth* claims stem from the NON while the pre-April 3, 2006 claims for

trespass, conversion, and unjust enrichment ultimately stem from the 2009 Notice of

Indebtedness.  To support its argument, the United States cites to *Valley View Angus Ranch, Inc.

v. Duke Energy Field Services, Inc.*, 497 F.3d 1096 (10th Cir. 2007).

In *Valley View*, Duke Energy Field Services, Inc. owned and operated a gas pipeline

which ran through the Valley View Angus Ranch.  The pipeline developed a leak so Duke

Energy Field Services, acting under an easement interest, attempted to go onto the Valley View

Angus Ranch to install monitoring wells.  Valley View Angus Ranch prohibited Duke Energy

Field Services from entering the property.  Duke Energy Field Services then filed a state court

action for breach of an easement agreement.  Valley View Angus Ranch subsequently filed a

federal court action against Duke Energy Field Services for trespass, nuisance, and unjust

enrichment.  Duke Energy Field Services argued that Valley View Angus Ranch should have

raised its federal court claims as compulsory counterclaims in the state case.  In analyzing the

factors for determining if the federal court claims constituted compulsory counterclaims, the United States district court held that "[t]here is some logical relation between the claim and the purported counterclaims simply because Duke alleges in the state court action that it entered plaintiffs' property for the purpose of determining whether there was a hydrocarbon leak and plaintiffs' claims herein are based on an alleged hydorcarbon leak, but this logical connection is attenuated." *Id*. at 1104. The Tenth Circuit upheld the district court's decision stating that "the only logical connection between the parties' claims is: they concern events (namely, the alleged damages caused by the pipeline leak and the subsequent denial of access to the pipeline to fix that leak) occurring at the same place, albeit at different times. This nexus, however, is too attenuated." *Id*. at 1105.

      *Valley View* is distinguishable from this case. As described above, *Valley View* involved two separate and distinct events (pipeline leak damages and denial of access) which occurred at the same location but at different times. Here, the United States issued the NON, the subject of *Bosworth*, because it believed Copar was unlawfully mining and selling pumice for common use purposes. In this lawsuit, the pre-April 3, 2006 claims are likewise based on Copar's alleged unlawful mining and selling of pumice for common use purposes. Accordingly, unlike *Valley View*, the same event, i.e., the purported unlawful mining and selling of pumice for common use purposes, occurring at the same location, i.e., the El Cajete mine, served as the grounds for both the *Bosworth* and the pre-April 3, 2006 claims. Hence, there is a rather strong logical relationship between the *Bosworth* claims and the pre-April 3, 2006 claims for trespass, conversion, and unjust enrichment.

   *e.  Would Claim Preclusion Bar the Pre-April 3, 2006 Claims for Trespass,*
   *Conversion, and Unjust Enrichment?*

Defendants also argue that claim preclusion would bar the pre-April 3, 2006 claims for

trespass, conversion, and unjust enrichment while the United States argues that claim preclusion

would not apply.  Claim preclusion bars a party or its privy from relitigating claims that were or

could have been raised in the first suit so long as the first suit resulted in a final judgment on the

merits.  *Park Lake Resources Ltd. Liability v. United States Dept. of Agriculture*, 378 F.3d 1132,

1136 (10th Cir. 2004).  "Under Tenth Circuit law, claim preclusion applies when three elements

exist: (1) a final judgment on the merits in an earlier action; (2) identity of the parties [or privity]

in the two suits; and (3) identity of the cause of action in both suits."  *MACTEC, Inc. v. Gorelick*,

427 F.3d 821, 831 (2005).  Generally, "[p]rivity requires, at a minimum, a substantial identity

between the issues in controversy and showing the parties in the two actions are really and

substantially in interest the same."  *Lowell Staats Min. Co. v. Philadelphia Elec. Co.*, 878 F.2d

1271, 1275 (10th Cir. 1989). Identity of the cause of action is determined under a "transactional

approach."  *MACTEC*, 427 F.3d at 832 (citations omitted).  The Tenth Circuit summarized the

transactional approach as follows:

> The transactional approach provides that a claim arising out of the same "transaction, or
> series of connected transactions" as a previous suit, which concluded in a valid and final
> judgment, will be precluded.  What constitutes the same transaction or series of
> transactions is "to be determined pragmatically, giving weight to such considerations as
> whether the facts are related in time, space, origin, or motivation, whether they form a
> convenient trial unit, and whether their treatment as a unit conforms to the parties'
> expectations or business understanding or usage."
>
> The transactional test has been rearticulated in a variety of ways, most of which focus
> upon whether the two suits are both based upon a discrete and unitary factual occurrence.
> For example, the First Circuit queries whether both suits depend upon "the same
> operative nucleus of fact."  The Seventh Circuit assesses whether the two claims "are
> based on the same, or nearly the same, factual allegations.  Some courts focus upon
> whether the two suits seek to redress the same injury.

*Yapp v. Excel Corp.*, 186 F.3d 1222, 1227 (10th Cir. 1999) (citations omitted) (emphasis added).

Once the claim preclusion elements are met, claim preclusion "is appropriate unless the party

seeking to avoid preclusion did not have a 'full and fair opportunity' to litigate the claim in the

prior suit." *MACTEC, Inc.*, 427 F.3d at 831 (citation omitted).  The Court will focus on the

elements of privity and identity of the cause of action because the United States does not contest

that *Bosworth* terminated with a final judgment on the merits.  *See* Ex. C, Amended Judgment

(Doc. No. 34), filed July 11, 2007 (attached to Defendants' Memorandum in Support of Motion

to Dismiss (*Res Judicata*)).

### (1) Privity

Defendants correctly maintain that there is privity between the United States and its

agency, the Forest Service, whose employees were sued in *Bosworth*.  The United States does

not dispute this proposition.  Instead, the United States observes that of the Defendants in this

case only Copar was a party to the *Bosworth* lawsuit and, therefore, there is no privity between

the parties.  However, it is well-established that the director of a corporation establishes privity

with the corporation and that a principal-agency relationship likewise establishes privity.  *See*

*Lowell Staats Min. Co.*, 878 F.2d at 1277 ("A director's close relationship with the corporation

will generally establish privity."); *ABS Industries, Inc. ex rel. ABS Litigation Trust v. Fifth Third*

*Bank*, 333 Fed. Appx. 994, 999 n.5 (6th Cir. 2009)(unpublished decision)("The federal courts

have similarly held that an agency relationship may constitute grounds for application of *res*

*judicata*.").  Certainly, as president of Copar, Defendant Kelly Armstrong and Copar are in

privity.  *See* Amended Complaint at ¶38. Moreover, the United States alleges in the Amended

Complaint at ¶44 that "[u]pon information and belief, Copar acted as the agent of the individual

Defendants in unlawfully mining and removing pumice from El Cajete Mine.  Upon information

and belief, the operations of Copar which constituted trespass and conversion were directed,

aided, abetted, and/or ratified by the individual Defendants/Claimants."  This principal-agency

relationship likewise constitutes privity.  In sum, the Court determines that the privity element

has been met.

### (2) Identity of the Causes of Action

The Defendants contend that the cause of action in *Bosworth* and the cause of action in

this case are the same because the claims in both lawsuits "arise out of the same mining activities

occurring at the same time and place."  Defendants' Memorandum in Support of Motion to

Dismiss (*Res Judicata*) (Doc. No. 19) at 9.   Defendants support this contention by citing to *Yapp*

*v. Excell Corp.*, 186 F.3d 1222 (10th Cir. 1999).  In *Yapp*, an employee first brought a lawsuit

for unpaid overtime compensation and then filed a second lawsuit for wrongful termination

which had occurred prior to the filing of the first lawsuit.  The Tenth Circuit agreed with *Clark v.*

*Haas Group, Inc.*, 953 F.2d 1235 (10th Cir. 1992), a case with similar facts, and held that the

there was an identity of the causes of action because both cases arose from "a single transaction:

the employment relationship."  *See id.* at 1228.

The United States argues that *Yapp* is not applicable to this situation because *Yapp*

involved the same plaintiff in each case whereas here the defendant in the first lawsuit is now the

plaintiff.  The United States cites to *Stone v. Department of Aviation*, 453 F.3d 1271 (10th Cir.

2006) in which the Tenth Circuit explained the subtle difference between claim preclusion

regarding the same plaintiffs in two different lawsuits and the case where a previous defendant is

now a plaintiff.  *Id.* at 1278-1281. The Tenth Circuit observed that where a previous defendant is

now a plaintiff claim preclusion obliges the former defendant to assert compulsory

counterclaims as required by law.  *Id.* at 1280.  As discussed previously, to determine whether a

claim should have been raised as a compulsory counterclaim, the Court must still consider if claim preclusion would have barred that claim.  *See, e.g., Hulsey*, 22 F.3d at 1487.

The United States also argues that the 2003 NON (the basis of the *Bosworth* litigation) and the 2009 Notice of Indebtedness (the basis of this litigation) are two separate transactions and, therefore, cannot constitute an identity of causes of action.  These separate and distinct documents, however, do not in themselves constitute separate transactions under the transactional approach.  Applying the principles of the transactional approach described in *Yapp*, it appears to the Court that the *Bosworth* claims and the pre-April 3, 2006 claims for trespass, conversion, and unjust enrichment are "based upon a discrete and unitary <u>factual occurrence</u>" (emphasis added), i.e., Copar's alleged unlawful removal of pumice for common use purposes.  In fact, the United States in *Cook II* characterized the claim in *Bosworth* as involving the issue of whether the United States can "prevent[] Copar from 'extracting locatable pumice and selling it for common variety purposes' in violation of 'the spirit and mandate of the Settlement Agreement.'" Ex. N, Defendant's Motion to Dismiss for Failure to State a Claim and for Lack of Jurisdiction (Doc. No. 7) at 13-14 (attached to Defendants' Reply in Support of Motion to Dismiss).  The United States in the Amended Complaint likewise alleges that "[t]he removal from El Cajete Mine and sale of pumice for common variety purposes was unlawful" and in violation the JNRAA and the 2002 Settlement Agreement. Amended Complaint at ¶¶37, 46, 50, and 57.  The Court, therefore, concludes that there is an identity of causes of action.  Because the three claim preclusion elements have been met with respect to the pre-April 3, 2006 claims for trespass, conversion, and unjust enrichment, the Court determines that claim preclusion would bar those claims.

### f. Conclusion

The only claims in this lawsuit which were mature at the time the United States served and filed its answer in *Bosworth* on April 3, 2006 were the trespass, conversion, and unjust enrichment claims which occurred prior to April 3, 2006.  Although issues of law between the *Bosworth* claims and the pre-April 3, 2006 claims for trespass, conversion, and unjust enrichment are different, these claims arguably share largely the same issue of fact.  Moreover, the same evidence used to support or refute the claims in *Bosworth* could have been used to support or refute the pre-April 3, 2006 claims for trespass, conversion, and unjust enrichment, albeit, additional evidence would have also been necessary to support or refute the pre-April 3, 2006 claims for trespass, conversion, and unjust enrichment.  Even so, there is still a strong logical relationship between the *Bosworth* claims and the pre-April 3, 2006 claims for trespass, conversion, and unjust enrichment.  Finally, claim preclusion would bar the pre-April 3, 2006 claims for trespass, conversion, and unjust enrichment.  On the whole, these factors warrant a determination that under Rule 13(a)(1) the United States should have raised the pre-April 3, 2006 claims for trespass, conversion, and unjust enrichment in *Bosworth* as compulsory counterclaims.  Those claims are now barred and summary judgment will be granted dismissing those claims with prejudice.

### 2. Claim Preclusion and the Post-April 3, 2006 Claims for Trespass, Conversion, and Unjust Enrichment Not Raised in Bosworth

Defendants also assert more generally that claim preclusion bars the United States from bringing claims for trespass, conversion, and unjust enrichment which could have been brought in *Bosworth*.  Because the Court has already determined that the United States should have brought the pre-April 3, 2006 claims for trespass, conversion, and unjust enrichment as

compulsory counterclaims in *Bosworth* and that those claims are now barred, the Court will address the issue of whether the United States should have raised the post-April 3, 2006 claims for trespass, conversion, and unjust enrichment in *Bosworth*. To begin with, the Court emphasizes that since it did not determine that the post-April 3, 2006 claims for trespass, conversion, and unjust enrichment were compulsory counterclaims, those claims must necessarily be permissive counterclaims. In the context of permissive counterclaims, the failure to bring a permissive counterclaim in a lawsuit does not necessarily bar later actions. *See, e.g., Capitol Hill Group v. Pillsbury, Winthrop, Shaw, Pittman, LLC*, 569 F.3d 485, 492 (D.C. Cir. 2009); *Valley View*, 497 F.3d at 1101 n.8 (quoting Restatement (Second) of Judgments §22 (1982)). The failure to raise a permissive counterclaim in a lawsuit can only serve as a bar to a subsequent lawsuit "if 'the relationship between the counterclaim and the plaintiff's claim is such that the successful prosecution of the second action would nullify the initial judgment or impair the rights established in the initial action.'" *Valley* View, 497 F.3d at 1101 n.8 (quoting *Restatement (Second) of Judgments* §22(2)(b)). Here, Judge Johnson's decision in *Bosworth* to uphold the NON would actually support a successful prosecution of the United States' claims in this lawsuit. A successful prosecution of the post-April 3, 2006 claims for trespass, conversion, and unjust enrichment would, therefore, not in any way nullify the Amended Judgment in *Bosworth* and would not impair the rights of the Defendants as established in *Bosworth*. Hence, the Court concludes that claim preclusion arising from *Bosworth* does not bar the post-April 3, 2006 claims for trespass, conversion, and unjust enrichment.

    2.  *Claim Preclusion and Cook II*

    Defendants further contend that *Cook II* provides a basis for claim preclusion barring the United States from bringing its claims in this case. The United States argues that Defendants

have not established an identity of the causes of action between *Cook II* and this case, thereby failing to show that there is claim preclusion.[14]  The United States also argues that it was not required to raise any compulsory counterclaims in *Cook II* because it did not file an answer in *Cook II*.  Defendants clarify in Defendants' Reply in Support of Motion to Dismiss that they are not arguing that the United States should have raised any compulsory counterclaims in *Cook II*. Defendants are simply asserting that claim preclusion bars the current claims by virtue of the *Cook II* litigation.

Defendants' assertion of claim preclusion in the context of *Cook II*, however, suffers from a fundamental flaw.  Both the Defendants and the United States analyze this claim preclusion issue under the more usual scenario where "[a] plaintiff files suit against a defendant based on a particular transaction and the suit proceeds to a judgment.  The plaintiff then files a second action against the same defendant based on the same transaction."  *Valley View*, 497 F.3d at 1100.  That is not the situation here.  In *Cook II*, the United States was not the plaintiff. Consequently, the United States is not barred from bringing a second lawsuit unless it could have brought its claims as compulsory counterclaims in *Cook II* or if "successful prosecution of the second action would nullify the initial judgment or would impair rights established in the initial action." *Id*. at 1101 n.8 (quoting *Restatement (Second) of Judgments* §22(2)(b)).   The Defendants are not arguing that the United States should have brought compulsory counterclaims in *Cook II*.  In fact, because the United States filed a motion to dismiss instead of an answer in *Cook II*, "Rule 13(a) does not come into play...."  *Mellon Bank, N.A. v. Ternisky*, 999 F.2d 791, 795 (4th Cir. 1993).  *See also* The Late Charles Alan Wright, Arthur R. Miller,

---

[14]The United States does not contest that the final judgment or privity elements of claim preclusion have not been met.

33

Mary Kay Kane, & Richard L. Marcus, 6 *Federal Practice & Procedure (Civil)* §1417 (3d ed.).

Moreover, because *Cook II* left the 2002 Settlement Agreement intact, a successful prosecution

of this case based on a violation of the 2002 Settlement Agreement would neither nullify the

judgment in *Cook II* nor impair any rights established in *Cook II*.  Hence, *Cook II* in no way bars

the United States' claims in this present action.

*E.  Conclusion*

   The Court concludes as a matter of law that the United States' pre-April 3, 2006 claims

for trespass, conversion, and unjust enrichment are barred because they should have been raised

as compulsory counterclaims in *Bosworth*.  Summary judgment will, therefore, be granted as to

those claims.  The Court further concludes as a matter of law that the remainder of the United

States' claims are not barred by Rule 13(a)(1) or claim preclusion.

   IT IS ORDERED that the Defendants' Motion to Dismiss (*Res Judicata*) (Doc. No. 18) is

granted in part in that partial summary judgment will be entered in favor of Defendants on the

United States' pre-April 3, 2006 claims for trespass, conversion, and unjust enrichment, and

otherwise is denied.


_____
SENIOR UNITED STATES DISTRICT JUDGE